**ELLIOTT v. AMALGAMATED MEAT CUTTERS AND BUTCHER WORKMEN OF NORTH AMERICA, A. F. OF L. et al.**

No. 762.

United States District Court
W. D. Missouri, Southwestern D.

July 6, 1950.

[1]. No opinion for publication.

Walter N. Moldawer, Washington, D. C., Evert P. Rhea, Fort Worth, Texas, for petitioner.

Daniel J. Leary, Joplin, Missouri, A. L. Commons, Miami, Oklahoma, for respondents.

RIDGE, District Judge.

In this proceeding, the Regional Director of the Sixteenth Region of the National Labor Relations Board seeks a temporary injunction, under Section 10($l$) of the National Labor Relations Act, as amended, 29 U.S.C.A. § 160($l$), to enjoin alleged violations by respondents of Section 8(b), Subsections (4)(A) and (B) of said Act, 29 U.

S.C.A., 158(b), (4)(A, B), on the following state of facts:

Western, Inc., formerly known as Banfield Packing Company, is a meat packer, with a packing house at Miami, Oklahoma, and sells meat processed by it in the tri-state area of Northeastern Oklahoma, Southwestern Missouri and Southeastern Kansas. Respondent Local 303 of the Amalgamated Meat Cutters and Butcher Workmen of North America is engaged in organizing activities in the above-mentioned territory. On November 24, 1948, pursuant to a petition filed by respondent Local 303, an election was conducted at Western's plant by the National Labor Relations Board to determine the collective bargaining representative of employees of Western. Local 303 lost that election. In September, 1949, Local 303 made plans to again organize the workers of Western and thereafter made demands on Western for recognition of the Local as collective bargaining representative of Western's employees and that Western negotiate a collective bargaining contract with it, covering wages, hours and conditions of labor of Western's employees. Western rejected such demand, unless and until the Local had been duly designated as representative of its employees at an election held for that purpose pursuant to the Act. Thereupon, as of midnight November 23, 1949, Local 303 placed Western on its "Unfair List" and notified all of its members accordingly. After Western was placed on its "Unfair List" the Local passed a resolution, incorporated in the minutes of one of its meetings, that "no meat cutter of Local 303 shall buy any meat from Western" and that "no one shall handle any meat" of Western after November 23, 1949. Thereafter, the Business Agent of Local 303, his secretary, and one or two other officers of the Local, stated to members of the Local that they were not to handle, buy, or sell Western's meats as of midnight November 23, 1949, and that if they did so, the by-laws of the Local provided that they could be subject to a fine of $100 or $150 by the Local. Thereupon, various individual members of the Local informed their employers who were then doing business with Western, of the action so taken by the officers of their Local, and that they (said employees) would be subject to a fine by the Local if they were required to work on Western's products. The Business Agent of Local 303 personally contacted some of said employers and caused letters to be sent to other employers, employing members of Local 303, informing them that Western was on the "Unfair List" and that members of Local 303 were not allowed to handle meats from Western, and, that their employees who were members of Local 303 could be fined if they handled meat delivered to said employers by Western. On or about November 25, 1949, a number of meat wholesalers who customarily did business with Western stopped buying meats from it. It is fair to say that said wholesalers ceased doing business with Western after receiving notice that Western had been placed on Local 303's "Unfair List" because they did not desire to have any labor difficulties with their employees who were members of Local 303, or subject their employees, members of said Local, to the imposition of a fine. They did so without any strike, slowdown, or secondary boycott being made against their individual places of business. In some instances, the buyers of meats at some of the wholesale and retail markets were members of Local 303 and had discretion as to from whom they would purchase meats. In the last-mentioned instances, said persons ceased buying meats from Western solely because of the fact that Western had been placed on Local 303's "Unfair List". Each wholesaler, retailer and buyer of meats who formerly did business with Western who testified herein, stated that they were not personally coerced, or intimidated in any manner, not to do business with Western. There is no evidence in this case that any direct threat to strike any meat dealer who did business with Western was ever made, or that any picket or other sanction would be made by Local 303, and its members, against the place of business of such meat dealers. There is not evidence in this case of a work stoppage caused by members of Local 303 at the place of business of any meat dealer who did business with Western, except in one slight instance, at the

McNabb market, where some beef arriving in late afternoon was not handled until the next morning. An inference to be made from all the evidence in this case is that a number of meat dealers decided to cease doing business with Western because they were apprehensive, from statements made to them by their individual employees, and in some instances by the Business Agent of Local 303, that if they continued to purchase and deal in Western's products some sort of labor trouble might eventually follow or ensue in their relation with members of Local 303 employed by them. Individual members of Local 303 have with concerted action stated that they would not continue to work on products produced by Western.

On January 25, 1950, after negotiations with Western had reached a stalemate, Local 303 called a strike at Western's plant, and has picketed the packing house located at Miami, Oklahoma, since that date. On several occasions, the Business Agent of Local 303, his wife, and one or two members of its negotiating committee, followed the trucks of Western driven by Western employees when deliveries were being made to Western's customers in cities other than at Miami, Oklahoma. Western does the major portion of its business with customers residing in the tri-state area outside of Miami, Oklahoma, where its packing plant is located. On the occasions above mentioned, while the trucks of Western were parked outside of customers' stores, a Union picket peacefully picketed the immediate area of the truck in a manner so as not to interfere with deliveries therefrom, and carried a sign stating in effect that Western was unfair to Local 303. At the same time, one and sometimes two members of the party that followed said trucks would enter a customer's store and talk to whomever was behind the meat counter, whether owner, manager, or meat cutter, and request them not to buy from Western or handle Western products. There is no evidence that any threats were made against such storekeepers if they continued to do business with Western, or that any of them acceded to such requests. When Western's trucks left such customer's store, the pickets immediately retired. That the picketing so done

was peaceful, is manifest in the relation between those who followed Western's trucks and Western's drivers, as they would eat their lunch together and Western's driver would inform the party following him of the next place that he would make a delivery. The picketing of Western's trucks was done at places of business where the meat cutter was not a member of Local 303; at places that might be termed small independent store operations. At the places of business where Western's trucks were picketed, orders for the meat delivered had been procured by salesmen of Western, or on orders telephoned to Western by such customers. Customers rarely, if ever, made personal visits to the packing plant of Western in Miami, Oklahoma, and there is no evidence in this record that at the places where Western's trucks were picketed the customers had independent knowledge that Local 303 had declared a strike at Western's plant.

Local 303 has its principal office in Joplin, Missouri. Respondent H. J. Riddle is its business representative. In addition, Riddle is also a special organizer and representative of Amalgamated Meat Cutters and Butcher Workmen of North America, hereinafter called "International". Local 303 holds a charter issued by International, conferring jurisdiction over organizational activities in the tri-state area. Throughout the times herein mentioned, Riddle has kept International and its officers informed of all actions taken by him, and Local 303, with regard to efforts to organize Western. The International, in turn, through its various officers, has advised, guided and instructed Riddle, and Local 303, concerning such action, and the International has paid strike benefits to employees of Western who joined Local 303 in its strike.

Since Western was placed on the "Unfair List" by Local 303, and the calling of the strike at its plant, Western has lost some 100 to 150 accounts of customers who normally did $400,000 worth of business with Western. (There is no evidence before the Court that any customers of Western who ceased doing business with it has suffered any damage, or invasion of any

property rights by reason of any conduct, or threatened conduct, at the hands of respondents.) It is conceded that Western at all times herein mentioned was engaged in interstate commerce. There can be no question from the evidence before the Court but that Riddle, the International, and Local 303, are engaged in this Judicial District, through their duly authorized agents and representatives, in an endeavor to organize Western and that some of the "unfair labor practices" here charged, have occurred in this District. Therefore, the matters and things above related constitute the transacting of business by them within the purview of Section 10(j) of the National Labor Relations Act, and this Court has jurisdiction of the parties and the subject-matter of this action.

On or about May 15, 1950, Western filed a charge with the National Labor Relations Board, charging that respondents have engaged in, and were then engaging in, unfair labor practices within the meaning of Section 8(b), Sub-sections (4)(A) and (B) of the National Labor Relations Act, by reason of the matters, facts and things above related. Said charge was duly referred to petitioner, as Regional Director of the Sixteenth Region of the Board, for investigation, and, after investigation, petitioner, deeming that he had reasonable cause to believe, and believing, that said charges are true, instituted the instant action under Section 10(l), supra.

Since the time of the calling of the strike at Western, both Local 303, and Western, petitioned the National Labor Relations Board to hold another election at Western's Miami, Oklahoma, plant, for the purpose of determining the proper bargaining representative of the employees of Western. An election will be held by the National Labor Relations Board at such plant in the very near future. Thus, the employees of Western who are directly involved in the instant labor dispute will be able to decide what labor organization they desire to represent them in their relations with Western, or whether they desire no labor organization to so represent them.

The gravamen of the complaint herein is that Local 303, the International and their agents under the above state of facts are engaged in what is commonly called a "secondary boycott," to "force or require" customers of Western to cease doing business with it, or to "force or require" Western to recognize and bargain with Local 303. Therefore, we must first determine whether there is substantial evidence before the Court from which it may be said petitioner was led to believe that a secondary boycott within the purview and intendment of Section 8(b) (4)(A) or (B) of the Act, supra, existed and, if so, whether respondents are fairly shown to be engaged in it, or with having induced or encouraged it. If a secondary boycott within the purview and intendment of said sub-sections is not shown to exist, or to be imminently threatened, then interim relief, within the gravamen of the complaint should not be granted. Under such circumstances, petitioner would have no reasonable cause to believe that respondents were in violation of Section 8(b) (4)(A) or (B), supra.

We are not here concerned with the existence and effect of the primary strike at Western, except as it may be considered in relation and effect to other facts shown in evidence. Neither are we here called upon to decide whether in fact the charges of "unfair labor practices" here made are true. That matter, under Section 10(e) and (f) of the Act is to be left to the Board for determination. The granting of a temporary injunction herein, is wholly dependent on a finding by the Court that petitioner had reasonable cause to believe that a violation of Section 8(b) (4)(A) and (B), has been committed under the above state of facts, and that equitable relief should now be granted to restrain such conduct, so as to maintain the *status quo* pending final adjudication of the labor dispute between Western, Local 303, and International. Section 10(l) of the Act says that we may grant relief if we deem it "just and proper, notwithstanding any other provision of law." We construe these words to justify the application of orthodox equitable principles in cases of this sort and that we may

"exercise [our] discretion to fit the needs and circumstances" of this case. Douds v. Wine, Liquor & Distillery Workers Union, D. C., 75 F.Supp. 447, 451; Hecht Co. v. Bowles, Price Administrator, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754.

■ Section 8(b) (4)(A), supra, makes it an "unfair labor practice" for a "labor organization or its agents * * * to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, * * * or otherwise handle or work on any goods, * * * *where an object thereof* is: (A) forcing or requiring any employer * * * to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, * * * or to cease doing business with any other person." It is to be noted that under said section it is the use of coercion on a third party, in a labor dispute, that characterizes and makes unlawful the activities there set forth. "To warrant an unfair labor practice finding in this case under Section 8(b), 4(A), two factors must combine * * * (1) the alleged activities must have as an object the forcing or requiring any employer, *inter alia,* to cease using the products of any manufacturer or to cease doing business with any person; and (2) the activities must constitute inducement and encouragement of employees in the course of their employment within the meaning of Section 8(b), 4(A). The absence of either factor will defeat the charges" here made as to any 8(b) (4)(A) violations. Printing Specialties and Paper Converters Union v. Le Baron, 9 Cir., 171 F.2d 331. "Forcing or requiring" as used in the above section connotes the use of coercive activities. Therefore, the object of any inducement or encouragement given to employees herein within the intendment of (A), supra, must be to coerce the employer of such employees as are covered by the Act.

■ In the case at bar there is evidence that the by-laws of the Local subject to fine or expulsion any member of the Local who fails to comply with orders of Union officials. Further evidence is that officials of the Local directed the members thereof not to work on goods of Western and told them if they did so they would be subject to a fine by the Local. After those things transpired, individual members of the Union related such facts to their employers who were customers of Western. Officials of the Union made similar statements to some employers and in some instances requested that employers cease doing business with Western. Some employer customers of Western did cease doing business with it. Such are the basic factors that are said to establish a secondary boycott under Section 8(b) (4) (A), supra. (We hereafter separately treat with picketing.) There is no evidence before the Court of any threat to call employees of customers of Western out on strike, or that any other sanctions would be enforced against such customers' business if they continued to do business with Western. A fair inference to be made from the testimony in this case as to customers of Western, who ceased doing business with it, is that they did so because they were of the opinion that to continue to do business with Western might in the future eventually lead to some labor difficulties at their places of business; and that they did not want to subject their employees to be fined by the Union if they required them to work on Western's products. The attitude and position thus taken by said customer employers appears to have been self-determinative, and taken by said employers without any of their property rights having been invaded. We consider the action so taken by said customer employers to be self-assumed and not a course of action having been taken as the result of coercive conduct directed toward them through their employees by the Local of International within the intendment of Section 8(b) (4) (A), supra.

In this case, coercion was directed against employees of customers of Western so as to make them not want to work on Western's products, if they were otherwise disposed. The object thereof was unquestionably to have said employees refuse to work on Western's products. Those who

directed such action by the Local undoubtedly believed that it would be disturbing news to employers of its members. Disturbing though it may have been, yet we cannot say from the evidence before us that it had the singular effect of coercion, so that such employers were "forced or required" to cease doing business with Western. The threats of a fine to members of the Local if they worked on Western's products, is not shown to have caused any work stoppage by members of the Union, except perhaps in one slight instance at the McNabb market. The evidence reveals that notwithstanding the threat of a fine, members of Local 303 did continue to work on products of Western until their employers ceased doing business with Western, under the above-related circumstances. Every employer customer of Western who gave testimony at the hearing on application for temporary injunction, which consumed the major part of three days, stated that they were not forced or required to cease doing business with Western. In light of their positive testimony to that effect, and circumstances here revealed, we cannot assume otherwise. Absent evidence of coercion, and of conduct, or threatened conduct, on the part of Local 303, the International, and their agents, inimical to property rights of employer customers of Western, we do not believe that a finding can be made that a secondary boycott probably exists under the circumstances of this case, within the purview of Section 8(b) (4) (A), supra, from the evidence relating to a threat of a fine, and directions given to members of the Local, as here claimed by petitioner.

◼ Has there been a probable violation of Section 8(b) (4) (B), of the Act under the above state of facts? Sub-section (4) (B) of Section 8, makes the object of inducement or encouragement to employees of a third party employer, to refuse to work on goods in interstate commerce, unlawful, where the object is to "forc[e] or requir[e] any other employer to recognize or bargain with a labor organization." There can be no question but that the object of respondents' threat of

fine, and direction to members of Local 303 not to work on goods of Western, falls within the ambit of Sub-section (4) (B), supra. The object thereof was to induce employees of employer customers of Western to cease working on Western's products, so as to force Western to recognize and bargain with Local 303. Local 303 is not a certified Union for Western's employees. Therefore, it cannot induce, encourage, direct or coerce its entire membership who are not employees of Western to cease working on Western's products until Western recognizes and bargains with it. Douds v. Wine, Liquor and Distilling Workers Union, supra. Although Section 8(b) (1) of the Act preserves the right of labor organizations to regulate their internal affairs, we do not believe that a bylaw, or directive of a Union, that is manifestly opposed to the letter and intendment of a positive prohibition of the Act here considered can be relied upon to justify activities that are specifically declared unlawful by said Act.

◼ We need not labor further as to a violation of Section 8(b) (4) (B) of the Act. It is evident in the facts above stated. A question remains, however, as to whether the granting of a temporary injunction because of such violation would be "just and proper" under the circumstances of this particular case. The granting of a temporary injunction in this sort of a proceeding is an interim function, to maintain the *status quo*. How, we may ask, before such extraordinary process is issued, will the *status quo* be maintained by the granting of that relief. As we understand petitioner's position, it will be maintained by the removal of a restraint directed at members of Local 303, who are not employees of Western.

◼ Local 303 has placed Western on its "Unfair List". Petitioner concedes, and rightly so, that an "Unfair List" is a protected activity of a labor organization. The Board has so ruled. In re Denver Building and Construction Trades Council and The Grauman Company, 87 N.L.R.B. No. 136 (1949). Without the express direction from respondents, each Union

member might be guided by his own conscience, to determine for himself, whether he wishes to handle Western's products, because Western is on Local 303's "Unfair List" and he may tell his employer that he refuses to handle Western's products because of that fact. Action so taken by individual members of Local 303 would not, and could not, no matter how concerted its effect, be a violation of any provision of the Act here considered. United Brotherhood of Carpenters, etc. v. Sperry, 10 Cir., 170 F.2d 863, 868. Though respondents may be said to be in violation of Section 8(b), (4) (B), supra, an interim injunction, such as we are here asked to issue, would not, in our opinion, effect a change in any situation that existed at the date the hearing was held on application therefor. Some employer customers of Western testified that they ceased doing business with Western when they learned that Western was on Local 303's "Unfair List", and others stated they did so after learning that pickets had been established at Western's plant. As above stated, the general course of action taken by customer employers was voluntary in character and without the effect of coercion directed at them within the intendment of 8(b) (4) (A) of the Act. From the testimony before us, looking at realities and not theorizing, we believe that such customer employers would continue to refrain from doing business with Western, irrespective of respondents' violation of Section 8(b), (4) (B), supra. To grant an injunction restraining respondents' violation under such circumstances would not establish a condition so as to maintain the *status quo* as contemplated by the Act. Injunctive process should not issue where the probabilities are that no immediate benefit would be attained by its issuance.

 As to picketing of Western's trucks. Petitioner says that "the picketing of Western's trucks while making deliveries of meats to Western's customers was obviously intended to notify the employees of such customers that the meats were crossing a picket line and were therefore unfair," and was clearly done "to induce them not to handle the product so delivered over the picket line." Relying on Printing Specialties and Paper Converters Union v. LeBaron, supra, petitioner contends that such conduct is unlawful "stranger picketing" under the Act and should be enjoined. The facts in the case at bar are to be distinguished from those in the Printing Specialties case, which there led to the issuance of a temporary injunction. There, but not here, the trucks picketed were those of an independent trucking concern, operated by drivers, neither of whom had any interest in the labor dispute Sealright was then engaged in. As a result of such picketing, the independent trucker, however, refused to continue to handle or transport Sealright's products. A secondary boycott of Sealright's product by "stranger picketing" was clearly established in the Printing Specialties case. Here, the picketing is directed at deliveries being made from Western's own truck, by Western's own employees. There is not an iota of evidence before the Court in this case that the effect of picketing of Western's trucks resulted in any employees of customers of Western to concertedly refuse to handle any of Western's products; or that any of Western's customers refused or threatened to refuse to do business with it on that account. The criteria recognized as essential by the Court in the Printing Specialties case "to warrant an unfair labor practice finding" have not been shown to exist by the evidence relating to peaceful picketing in the case at bar.

[13, 14] We find nothing in the terms of the Act here considered that announces a public policy on the part of Congress, to confine primary picketing to a single situs of an employer's place of business. As we perceive the Act, it was intended to keep the situs of a labor dispute confined to actual functions of the parties involved therein and not to permit such disputes to be carried to areas that would be inimical to the rights of a third person, not so involved. There can be no question but that primary picketing peaceably conducted is not made unlawful by the Act. It is "stranger picketing", i. e., picketing in aid of a sec-

·ondary boycott, that is declared illegal thereunder. Therefore, in determining whether the picketing of Western's trucks, as here shown, is lawful or illegal, we should look at it in the setting of the circumstances that gave rise thereto, and in the light of the general law of picketing as gleaned from pronouncements of recent controlling decisions.

In In re International Brotherhood of Teamsters, etc., and Schultz Refrigerated Service, Inc., 87 N.L.R.B. 82, the Board held that the picketing of the trucks of a primary employer was not an unfair labor practice. The employer in that proceeding was engaged in the trucking business and it was held that the situs of that labor dispute was the location of the truck because of the roving nature of the primary employer's business. In the course of its opinion therein, the Board said: "Necessarily, then, one important test of the lawfulness of a union's picketing activities in the course of its dispute with an employer is the identification of such picketing with the actual functioning of the primary employer's business at the situs of the labor dispute."

Using such test and applying it to the facts of the instant case, we find that Western, with a packing plant at Miami, Oklahoma, doing business in the tri-state area, sells the greater portion of its products through the solicitations of its salesmen and by truck deliveries in localities some distance from Miami, that rarely do its customers who purchase its products go to its plant to purchase or accept delivery of the same. It seems clear to us that the situs of Western's labor dispute, under the particular facts of this case, is of necessity carried to places of business where Western's salesmen regularly call on its customers and where its trucks make regular deliveries of its products. Western established such activities as part of the *modus operandi* of its business and it is through such conduct that it continues to carry on practically normal business operations, notwithstanding the strike that is in existence at its packing plant. (Western's officers testified that they were operating at normal capacity, notwithstanding initial loss of business above set forth.) In the setting of this case, we think that the lawfulness of the picketing of Western's trucks should be determined by a consideration of the factors that gave rise to Bakery & Pastry Drivers and Helpers Local 802, etc. v. Wohl, et al., 315 U.S. 769, 62 S.Ct. 816, 86 L.Ed. 1178, and the test stated by the Board in the Teamsters case, supra, and that it should not be considered "stranger picketing" violative of the provisions of 8(b) (4) (A), supra. In light of the decisions of our Supreme Court in the Wohl case and in Thornhill v. State of Alabama, 310 U.S. 88, 102, 60 S.Ct. 736, 84 L.Ed. 1093; American Federation of Labor v. Swing, 312 U. S. 321, 61 S.Ct. 568, 85 L.Ed. 855, we should be reluctant to declare the peaceful picketing, as established in the case at bar to be "unlawful" and say that it was only directed to the purpose of a secondary boycott. The geographical distance of the picketing here considered from the area of Western's plant, does not, standing alone, characterize it as being unlawful. The determination of its relation to the business of Western and its direct effect on the functions thereof must be considered. The geographical setting plus the immediate relation of the picketing to the mode of Western's conduct of its business, we think makes it primary picketing and not picketing whose sole purpose is to foster secondary boycott.

The requests made to customers and their employees not to purchase Western's products was not a violation of Section 8(b) (4) (A) of the Act. There is no evidence that any of such customers acceded to said requests. Under such circumstances, the Board, itself, has held that Section 8(b) (4) (A) is not violated by a Union's request of a company to stop doing business with the primary employer, even if the request is coupled with a threat to picket the company, if it fails to heed the request. United Brotherhood of Carpenters and Joiners, 81 N.L.R.B. No. 127 (1949). As above indicated, this Court fulfills its responsibility under the Act here considered by maintaining the *status quo*

until the processes and procedure of the National Labor Relations Board can be applied to the labor dispute Western now has with the Union. We do not perceive how the granting of the extraordinary relief here sought can be effective to change the situation surrounding the parties as it existed at the time of the bringing of this action, or be of aid to the Board in the exercise of its prerogative to resolve said dispute, because of respondents' violation of 8(b) (4) (B) of the Act. We are not compelled to act where our action is thought to be futile. Instead of granting immediate relief for said violation, we shall retain this cause on the docket, subject to motion by the Regional Director, of any indication of fines being assessed by the Union against any member of the Union because of the matters, facts or things here reviewed, or as to any other claimed violations of the Act not now considered. It is so ordered.