Gerald A. BROWN, Regional Director of the Twentieth Region of the National Labor Relations Board for and on behalf of the National Labor Relations Board, Petitioner,

v.

LOCAL NO. 17, AMALGAMATED LITHOGRAPHERS OF AMERICA, and Amalgamated Lithographers of America (Ind.), Respondents.

No. 38735.

United States District Court
N. D. California, S. D.
Jan. 13, 1960.

Walter N. Moldawer, N. L. R. B., Washington, D. C., for petitioner.

Robinson, Silverman & Pearce, by Benjamin M. Robinson, and Matthew Silverman, New York City, Garry, Dreyfus, McTernan & Keller, by Francis J. McTernan, San Francisco, Cal., for respondents.

SWEIGERT, District Judge.

This proceeding is brought, pursuant to Section 10(*l*) of the National Labor Relations Act, as amended (61 Stat. 146; 73 Stat. 544; 29 U.S.C.A. § 160(*l*), which provides that, whenever, after investigation, the Regional Director has reasonable cause to believe that a charge of unfair labor practice is true, and that a complaint should issue, he shall petition the United States District Court for appropriate injunctive relief, pending final adjudication of the Board, and that, upon the filing of any such petition the Court shall have jurisdiction to grant such injunctive relief as it deems just and proper.

On November 25, 1959, the Employing Lithographers, a division of the Graphic Arts Employers Association, and Lithographers and Printers National Association, Inc., filed charges with the National Labor Relations Board, alleging that respondents Local No. 17, Amalgamated Lithographers of America, generally referred to as Local 17, and Amalgamated Lithographers of America, generally referred to as the International, were engaging in certain unfair labor practices within the meaning of the N. L. R. A., specifically Section 8(b) (4) (i) and (ii), subparagraph (A) and of Section 8(e) of the Act, as amended by the last Congress in that part of the Labor-Management Reporting and Disclosure Act of 1959, popularly referred to as the Landrum-Griffin Bill, dealing with secondary boycott. Thereupon, on December 7, 1959, pursuant to Section 10(*l*), the Regional Director commenced this proceeding.

For the purposes of our discussion, we proceed in the following order: (1) the legislative history and background to the recent amendments of the new labor

law: (2) the charges brought by petitioner as the basis for this proceeding; (3) the position of respondents in regard thereto; (4) the controversial clauses here sought to be enjoined; (5) the constitutionality of the statute; and, finally, (6) the scope of discretion in statutory injunction proceedings of this kind.

### I.

*Legislative Background*

For an understanding of the new secondary boycott provisions here involved, it should be recalled that in 1947 Congress passed the Labor-Management Relations Act, 61 Stat. 146, 29 U.S.C.A. § 151 et seq., generally called the Taft-Hartley Act, enacting Section 8(b)(4) as an addition to the National Labor Relations Act, and making secondary boycott an unfair labor practice, to the extent that it became unlawful for a labor organization to engage in, or to induce or encourage employees to engage in, a strike or concerted refusal to handle goods or perform services with the object of forcing or requiring an employer or other person to cease handling the products of another or to ‾cease doing business with any other person.

The declared purpose of this secondary boycott legislation was to narrow the area of industrial dispute, so as to confine its effects to those immediately interested, and to prevent its extension to employers and employees not directly involved—all in the public interest.

Since 1947, labor unions, for the purpose of avoiding violation of this secondary boycott provision of the Taft-Hartley Act, have developed the practice of bargaining with employers for inclusion in collective bargaining agreements of so-called "hot cargo" clauses whereby the employer agrees to refrain from requiring his employees to handle the products of other employers considered by the union to be unfair because produced under non-union conditions or in a plant struck by the union.

In the so-called "Sand Door" case, Local 1976, United Brotherhood of Carpenters and Joiners of America, A. F. L.

v. N. L. R. B., 1958, 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186, the Supreme Court held that such clauses were not illegal, pointing out that under the then existing secondary boycott provisions, the legal prohibition was directed, not at any contractual agreement entered into on the part of the employer, but only at union inducement of employees to strike or refuse to handle goods with the object of forcing employers to cease doing business with third parties.

Late last year, the Congress considered and passed the Landrum-Griffin Bill, Pub.Law 86–257, September 14, 1959, which, so far ̇as pertinent here, was designed to close what both House and Senate Committees described as a "loop hole" in the existing secondary boycott law.

Retaining the pre-existing secondary boycott provision (now Section 8(b)(4) (i), the Congress enacted amendments to the National Labor Relations Act, effective sixty days after enactment, Friday, November 13, 1959, which now provide:

*Section 8(e)* "It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling * * * or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void."

*Section 8(b)(4)(i) and (ii), subparagraph (A)* "(b) It shall be an unfair labor practice for a labor organization or its agents—

\* \* \* \* \* \*

"(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process,

transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

"(A) forcing or requiring any employer or self-employed person to join any labor or employer organization or to enter into any agreement which is prohibited by section 8(e)."

## II.
### Petitioner's Charges

The pending petition of the Regional Director, NLRB, alleges in substance as follows:

That on March 11, 1958, respondent union, Local 17, had entered into a collective bargaining contract with the Association.

That on August 17, 1959, Local 17 gave sixty days notice to the Association, and other independent lithographic employers, of its desire to terminate that contract at its expiration date, October 18, 1959, and called for negotiation of a new contract. An impasse was reached in these negotiations and since November 23, 1959, respondent union has engaged in a strike against the fifteen employer members of the Association.

That since October 12, 1959, Local 17 has demanded that the Association incorporate in a new collective bargaining agreement, certain clauses, claimed by the charging employers and by the NLRB, to be unlawful within the meaning of new Section 8(e) of the N.L.R.A.

That since the commencement of its strike on November 23, 1959, one of the objects of the strike against the Association members has been, and is, to force and require said employers to enter into these controversial clauses in violation of new Section 8(b) (4) (i) and (ii) subparagraph (A) of the N.L.R.A.

The petition further alleges that on November 25, 1959, respondent union, Local 17, entered into agreements with certain independent lithographic employers, who were not members of the Association, to the effect that these firms might continue to operate under the conditions of the old contract of March 11, 1958, upon assurance that all conditions in any new contract negotiated by Local 17 with the Association would be retroactive to October 19, 1959. Upon this understanding, Local 17 refrained from calling a strike against these independent lithographic firms.

It is admitted that the old contract contained certain secondary boycott clauses which, although lawful at the time the contract was made, became unlawful on November 13, 1959, the effective date of the new amendments. For that reason, petitioner further alleges that the arrangements made on November 25, 1959, by respondent union, Local 17, with these independent lithographic firms, concerning operations under the conditions of the old contract, constitute an unlawful agreement within the meaning of new Section 8(e).

With respect to the other respondent union, the International, it is alleged, established and admitted, that it has approved and participated in the acts and conduct of its Local 17.

## III.
### Position of Respondents

Respondents raise two main defenses to the petition: First, they contend that the clauses proposed for inclusion in any new collective bargaining agreement between Local 17 and the Association are not, when properly interpreted, unlawful under Section 8(b) of the N.L.R.A. as amended.

Second, they contend that in any event the new amendment, particularly Section 8(e), is unconstitutional, and is violative of the due process clause of the Fifth Amendment and of the free speech guarantee of the First Amendment to the Federal Constitution, etc., for the reason that the Section exempts two industries from its application—the construction industry and the apparel industry—without any factual basis for differentiating

these industries from the lithographic industry.

Respondents further contend that the court should, in the exercise of its discretion, deny the application for a temporary injunction.

With respect to the allegations concerning arrangements between Local 17 and the independent lithographic firms, respondents, conceding that certain secondary boycott provisions of the old collective bargaining contract became illegal on November 13, 1959, contend that the union agreement of November 25, 1959, with the independent employers, regarding continued operation under the old contract, was intended by the union to mean only the wage and working conditions thereof, and was not intended to compel compliance with the old secondary boycott clauses.

The agreement was however, not so expressly qualified, and this issue, involving a question of fact, is found adversely to the union. What if any injunctive relief should be granted in this situation will be considered *infra*.

## IV.

### *The Controversial Clauses*

We now proceed to consider the controversial clauses proposed by respondent unions for inclusion in any new collective bargaining contract with the Association.

The Court finds it to be true, in fact, that respondents have demanded and continue to demand, inclusion of these clauses and that such inclusion has been and is one of the objects of the present strike against the members of the Association.

There are, in all, five such clauses, all set forth in Exhibit D of the petition herein. Three of them can be conveniently discussed first and together—a so-called "Struck Work" clause, Section 23 (a) of the proposed collective bargaining agreement; a so-called "Chain Shop" clause, Section 23(b) of the proposed agreement, and a so-called "Termination" clause, Section 24 of the proposed agreement.

The "Struck Work" clause, supra, provides:

"(a) The Employers agree that they will not render assistance to any lithographic employer any of whose plants is struck by any Local of the Amalgamated Lithographers of America or the International or where members of any such Local or the International are locked out, and accordingly agree that in implementation of this purpose the employees covered by this contract shall not be requested to handle any lithographic work (other than work actually in process in the plant) customarily produced by such employer."

The "Chain Shop" clause, supra, provides:

"(b) The Employers agree that the employees covered by this contract shall not be requested to handle any work in any plant if in another plant of any employer or of any subsidiary of such employer in any part of the United States or Canada any Local of the Amalgamated Lithographers of America or the International is on strike or members of such Local or the International are locked out."

The "Termination" clause provides:

"In the event an employer requests any employee to handle any work described in paragraph (Section 23) above, or requests any employee to handle any work received from or destined for any employer involved in such strike or lockout, directly or indirectly (other than work actually in process in the plant), the Union, in addition to the other rights and remedies the employees and the Union have under this contract or the law, shall have the right in its discretion to terminate the contract forthwith as to that employer by giving written notice to said employer."

Respondent contends that the first two clauses, "Struck Work" and "Chain Shop" are within well recognized and

established exceptions to secondary boycott prohibitions.

The "Chain Shop" clause, respondent states, is merely designed to permit workers in one plant of a company to cease work when their union brothers are on strike in another plant of the *same* company, a fair labor practice recognized in J. G. Roy & Sons Co. v. N. L. R. B., 1 Cir., 1958, 251 F.2d 771; Bachman v. N .L. R. B., 8 Cir., 1959, 266 F.2d 599.

These cases recognized in effect that common ownership, coupled with common control over policy and operation, especially labor relations policy, renders the several concerns involved one integrated straight-line operation for secondary boycott purposes, and, therefore, "allies" not included within the protective embrace of the secondary boycott provisions.

■ The "Struck Work" clause, respondents contend, merely requires the employer to agree that he will not "ally" himself with another struck employer by taking care of the latter's customers, a fair union objective recognized in Douds v. Metropolitan Federation of Architects, Engineers, Chemists & Technicians, Local 231, D.C.S.D.N.Y.1948, 75 F.Supp. 672, and N. L. R. B. v. Business Machine and Office Appliance Mechanics Conference Board, Local 459, 2 Cir, 1955, 228 F.2d 553. These cases held in effect that, even in the absence of common ownership and control, the "farming out" of "struck work" by one concern to another, either directly or indirectly, renders the latter an "ally" of the former for purposes of secondary boycott, and, therefore, excludes it from the protective embrace of the secondary boycott provisions.

During the course of the hearing, respondents proposed revisions of the "Struck Work" and "Chain Shop" clauses (Respondents Exhibit L) which, they claim, will accomplish this purpose.

These proposed revisions read as follows:

"*Struck Work:*

"The Employers agree that they will not render production assistance to any lithographic employer any of whose plants is struck by any Local of the Amalgamated Lithographers of America, or International, or where members of any such Local or International are locked out, and accordingly agree that in implementation of this purpose the employees covered by this contract shall not be required to handle any lithographic work (other than work actually in process in the plant) customarily produced by such Employers."

"*Chain Shop:*

"Each company agrees that the employees covered by this contract shall not be requested to handle any work in its plant if in another plant of the Company or any subsidiary of the Company in any part of the United States or Canada any Local of the Amalgamated Lithographers of America is on strike, or members of such Local or International are locked out."

■ If these clauses express what respondents say they are intended to express, i. e., preservation of the so-called "ally" and "common ownership and control" exceptions to secondary boycott prohibitions, they would be permissible and legal. The legislative history clearly shows that it was not the intent of Congress to reject or alter these interpretations of secondary boycott prohibitions as expressed by the Courts. Conference Report, BNA, The Labor Reform Law, p. 145 (1959).

A comparison of the aforementioned "Struck Work" and "Chain Shop" clauses, and the proposed revisions thereof, leads the Court to conclude that further revision or clarification is necessary to assure that these clauses are within, and do not go beyond the exceptions.

For example, the "Struck Work" clause seems to commit the employer not to per-

form any work or services for any other employer in difficulty with the union even though the first employer had been customarily performing such work or services for the latter.

The so-called "ally" doctrine, as expressed in Douds v. Metropolitan and N. L. R. B. v. Business Machine, supra, seem to limit the "ally" doctrine to situations in which the one employer cooperates with and assists a struck employer by taking and doing work which the latter would customarily have done by itself but cannot continue to do because of the strike. Such work would be "farmed out" work.

It is doubtful that the "ally" doctrine extends to require one employer to cease to perform for another, not "farmed out" work, but work customarily done for the other under pain of becoming an "ally" of the latter.

The "Chain Shop" clause, seems to require the employer to refrain from requesting his employees to handle any work in his plant if in any other plant of the employer, or in any subsidiary of the employer, there is difficulty with the union.

The so-called common ownership and control exception, expressed in Roy, supra and Bachman, supra, seems to be limited to situations where there is, not only common ownership, but also such common control and integration of operations that the two employers are in effect, one.

The Court, therefore, concludes that the Regional Director had "reasonable cause" to believe that the "Struck Work" clause and the "Chain Shop" clause are, at least in part, in violation of Section 8(e).

The Court, however, is inclined to believe that further consideration and possible revision of these clauses, together with the related "Termination" clause, might assure their legality, and will retain jurisdiction to consider any such application.

■ Turning to the "Trade Shop" clause, this clause provides:

"The parties agree that all the terms of this contract have been negotiated on the assumption that all lithographic production work will be done under approved union wages and conditions. In the event any employer covered by this contract requests any employee to handle any lithographic production work made in any shop which was not under contract with the Amalgamated Lithographers of America and authorized to use the union label of the Amalgamated, then the Union in its discretion by notice in writing, may re-open the contract as to that employer for negotiations as to the whole or any part thereof. In the event of failure to agree on all terms within ten days after such re-opening, the Union shall have the right to terminate the contract forthwith as to that employer by giving written notice to such employer."

Then follow provisions concerning the use of the union label by all union shops and disclosure by the employer of the source of all work brought into a plant.

This "Trade Shop" clause, respondent contends, is not violative of Section 8(e) because the employer does not by this clause agree, promise or commit himself to handle or not to handle the products of any other employer. This clause, argues respondent, simply leaves it to the free discretion of the employer whether or not he wishes to handle lithographic work made in a shop not under contract with the union or a shop not authorized to use its union label.

Respondent points out that, as the clause states, the proposed contract is being negotiated on the assumption that employers are going to continue to conduct their business as it has been conducted in the past, i. e., that the employer will continue the policy of not handling the work or products of other employers who are either non-union or are being struck by the union.

The proposed "Trade Shop" clause, say respondents, is designed merely to protect the union against the possibility

that the employer may change his mind and his policies by deciding to handle such work.

In such event, argue respondents, although such change of policy would be the free decision of the employer, it would create new and numerous economic problems for the union and its members which could only be solved by new contractual arrangements concerning such matters as, for example, reconsideration of wage demands in the light of the employers' increased profits by reason of obtaining cheap work from foreign or non-union shops, or reduction of the work week, or modifications of apprenticeship ratios, or even establishment of an out-of-work fund.

Some evidence, together with material for judicial notice, was introduced at the hearing concerning what is claimed to be the unique, highly integrated organization of the lithographic industry for the purpose of demonstrating that such reconsiderations as outlined above would be practically necessary.

Although the Court considers the evidence insufficient to make a finding in accordance with this contention, and must, therefore, for purposes of this hearing, find adversely to the respondents, the Court has nevertheless considered the possibility that a more extended, detailed hearing before the NLRB may establish such contention to be the fact.

For purposes of its ruling, the Court will, however, take into consideration such "facts of life" factors, in its interpretation of the "Trade Shop" clause.

In its effort to interpret the "Trade Shop" clause properly and to relate it to Section 8(e), the Court has also considered the previously mentioned "Sand Door" case, supra, in which the Supreme Court, although holding secondary boycott clauses to be legal under then existing law, went on to hold that, nevertheless, such clauses would not justify, or constitute a defense to, eventual illegal inducement of employees to strike or refuse to handle goods with the object of forcing employers to abide by their previous agreement not to do business with non-union or struck third parties.

In reaching this conclusion, the Supreme Court, although it was there dealing with a somewhat different phase of the secondary boycott problem, recognized the "realities" that must be taken into consideration in order to interpret and apply legislation pertaining thereto.

Speaking for the Court, Mr. Justice Frankfurter said:

"A voluntary employer boycott does not become prohibited activity simply because a hot cargo clause exists. But there remains the question whether the employer has in fact truly sanctioned and supported the boycott, and whether he has exercised the choice contemplated by the statute. The potentiality of coercion in a situation where the union is free to approach the employees and induce them to enforce their contractual rights by self-help is very great. Faced with a concerted work stoppage already in progress, an employer may find it substantially more difficult than he otherwise would to decide that business should go on as usual and that his employees must handle the goods. His 'acquiescence' in the boycott may be anything but free. In order to give effect to the statutory policy, it is not unreasonable to insist, as the Board has done, that even when there is a contractual provision the union must not appeal to the employees or induce them not to handle the goods. Such a rule expresses practical judgment on the effect of union conduct in the framework of actual labor disputes and what is necessary to preserve to the employer the freedom of choice that Congress has decreed. On such a matter the judgment of the Board must be given great weight, and we ought not set against it our estimate of the relevant factors." 357 U.S. at page 107, 78 S.Ct. at page 1020, 2 L.Ed. 2d 1186.

It should be noted that the only difference in terminology between the secondary boycott provision of the old contract, which admittedly became illegal on November 13, 1959, and the revised provision demanded for inclusion in the new contract is that, while in the former the employer expressly agreed that he would not require his employees to handle "unfair" work, in the revised form the employer agrees that if he should so request his employees, then the union can, if necessary, terminate the contract.

Of course, slight differences in draftsmanship often call for important differences of interpretation, but in the present case it seems clear that the employers' agreement to such a condition of the contract is in itself an "agreement, express or implied, whereby such employer * * * refrains * * * from handling * * * or * * * dealing in any of the products of any other employer * * *" within the meaning of Section 8(e) as written and enacted by the Congress.

To say that an employer, who has agreed that the continual operation of all the important terms secured to him by a collective bargaining agreement will depend upon the continuation of a chosen decision or policy not to deal with certain other employers, does not thereby "refrain" from dealing with such other employers would be to disregard the "realities" referred to by the Supreme Court.

That would be to hold, in effect, that newly won, and possibly hard won, rights of great importance to the employer, are not realistically related to the strong motivations of self-preservation that shape his choice and determine his conduct. Considered in the light of human nature and the practical realities of labor management relations, there exists such intimacy of relation between an employer's valuable contract position and operating situation on the one hand, and his decision to refrain from doing business with other employers on the other hand, that such choice as he may exercise is not free, but forced.

If we assume that the employer's decision to refrain from doing business with certain other employers is in fact the result of his voluntary choice and preference in the first instance, then the clause still remains to limit and possibly determine his freedom to change his mind.

It is our conclusion, therefore, that the Regional Director had "reasonable cause" to believe that the employer's agreement to the condition subsequent in the "Trade Shop" clause is an agreement whereby the employer refrains from dealing with other employers within the intent and scope of Section 8(e).

■ We take up now the "Refusal to Handle" clause, which provides:

"The Employers agree that they will not discharge, discipline or discriminate against any employee because such employee refuses to handle any lithographic production work which was made in a shop not under contract with the Amalgamated Lithographers of America or not authorized to use the union label of the Amalgamated or because such employee refuses to handle any struck lithographic work of the type described in Sections 23 and 24."

This clause, respondents contend, merely preserves to the individual employee his freedom of choice to handle or refuse to handle what he considers to be products of a non-union or struck shop.

Of course, an individual employee has a right to refuse to perform services for an employer, a right with which the Congress obviously did not intend to interfere and with respect to which an employer may not coerce the employee.

It is also true, however, that an employer has a right to request an employee, during the employment relationship, to perform such services as the employer wishes, in the absence of an agreement to the contrary. Absent such agreement, it would not be coercion for an employer to request an employee to perform work where the employer gives the employee

the alternative of—as he must—leaving the employment.

Here we come to the point of the "Refusal to Handle" clause upon which the determination of its legality under the new amendment depends—the agreement of the employer with the union that he will not discharge, discipline or discriminate against an employee because such employee refuses to handle non-union or struck work.

In the absence of a statute to the contrary, such an agreement would certainly be permissible and valid. It so happens, however, that the Congress has now provided that any agreement whereby an employer refrains or agrees to refrain from handling the work of another employer is to that extent void and unenforcible.

The question, therefore, is whether the employer's agreement as contained in the "Refusal to Handle" clause falls within such prohibition.

On its face, the employer does not in terms refrain or agree to refrain from handling the work of other employers, but he does agree, commit and bind himself that, should one of his employees refuse to handle such work, the employer will not discharge, discipline or discriminate against such employee.

The considerations involved in determining whether such an agreement falls within the provisions of Section 8(e) are similar to those involved in the "Trade Shop" clause.

We must, therefore, conclude that the Regional Director had "reasonable cause" to believe that an employer who agrees and binds himself in such manner does by such agreement himself "refrain" from handling the kind of work of other employers described in the clause within the intent and scope of Section 8(e) to such extent the freedom of the employer to form his decision in concrete situations is impaired and coerced in a manner contrary to the evident intent of the Congress.

Having reached these conclusions, we should, however, note that under existing secondary boycott law, including of course, these recent amendments, an employer still may voluntarily decide to refuse to handle products of other employers, either because they are non-union, struck by a union, or otherwise.

It may well be that many employers, notwithstanding the recent amendments, will adopt such a policy either because they see eye to eye with the union, or because they desire to cooperate with the union, or because they realize the hostile attitude which exists on the part of many union employees against patronizing or handling the work of so-called "unfair" establishments—an attitude which, as Justice Douglas said in the dissent in the "Sand Door" case, supra, "goes deep into our history."

Secondary boycott clauses, reflecting this attitude, are, said Justice Douglas, 357 U.S. at page 115, 78 S.Ct. at page 1024: " * * * so much a part of the very fabric of collective bargaining that we should leave this policy-making to Congress and not rush in to undo what a century or more of experience has imbedded into labor-management agreements."

Now, however, the Congress has spoken. By the recent secondary boycott amendments Congress has resolved earnest, often emotional debate, by declaring that the public interest is best served by more effectively narrowing the field of labor management disputes by making secondary boycott agreements "void and unenforcible".

To say that these clauses do not come within Congressional intent and purpose, would go beyond reasonable limits of judicial interpretation and, would, in effect, manufacture a device for rendering its enactments virtually ineffective. Henceforth, as long as these enactments stand, unions must rely for furtherance of their traditional views upon their ability to persuade employers and to demonstrate the soundness of their position. But, agreements, express or implied, which in effect bind the employer to refrain from handling goods of, or dealing with other employers, are, as

the Congress has declared, "void and un-enforcible."

## V.

*Constitutionality*

Passing now to respondents' contention that Section 8(e) is unconstitutional, we note that the section contains two provisos, the first of which exempts the construction industry from the application of Section 8(e), and the second of which exempts the apparel and clothing industry from the application of both Sections 8(e) and 8(b) (4) (ii) (B).

Respondents do not attack the exemptions granted to the construction and garment industries. They concede that special circumstances exist which support both exemptions. Further, they concede basic differences between the lithographic industry and the construction industry. They do contend, however, that the garment industry and the lithographic industry have similarly integrated processes of production; that, therefore the lithographic industry should be granted the same exemption as the garment industry; that to the extent it is denied such exemption, Section 8(e) is unconstitutional as a violation of the due process clause of the Fifth Amendment to the Federal Constitution.

Respondents point out that, although the Fifth Amendment, applicable to the federal government, does not, like the Fourteenth Amendment, contain an equal protection clause, discrimination may be so gross as to be violative of the due process clause of the Fifth Amendment, citing the civil rights opinion in Bolling v. Sharpe, 1954, 347 U.S. 497, 498, 74 S.Ct. 693, 98 L.Ed. 884.

Respondents also call our attention to the Conference Report of the House Managers, purporting to interpret the garment industry exemption clause as follows:

> "This proviso grants a limited exemption in three specific situations in the apparel and clothing industry, but in no other industry regardless of whether similar integrated proc-

esses of production may exist between jobbers, manufacturers, contractors and subcontractors." BNA, The Labor Reform Law, 145 (1959).

Although the evidence in the present proceeding is insufficient to support a finding that the lithographic and garment industries have identical or substantially similar integrated processes of production, and although the finding on that issue must be adverse to the respondents, the Court recognizes the possibility that the allegation might be established in further proceedings soon to commence before the National Labor Relations Board.

Assuming, for purposes of discussion, that similarity in this respect does exist between the two industries, we should, on the other hand, take into consideration that there are also substantial economic and social differences; that the lithographic industry involves a highly skilled trade, much more so than the garment industry; that the lithographic industry is only a fraction of the size of the garment industry; that, historically, the garment industry has presented the peculiar problem of "sweat shops" and exploitation of the foreign born; that other differences exist which presumably were considered by the Congress.

With this view of the matter we review the well-established rules by which the constitutionality of Congressional enactments under the Commerce Clause, Article 1, Section 8, Clause 3, involving discriminations, classifications and exemptions, should be determined by the courts.

The courts have stressed that the Fifth Amendment, unlike the Fourteenth Amendment, contains no equal protection clause. See: Currin v. Wallace, 1938, 306 U.S. 1, 13–14, 59 S.Ct. 379, 83 L.Ed. 441.

█ Assuming, that there might be a discrimination of such injurious character as to bring into operation the due process clause of the Fifth Amendment, Bolling v. Sharpe, supra, mere lack of uniformity in the Congressional exercise

of the commerce power does not constitute a denial of due process, Currin v. Wallace, supra.

Almost without exception the courts have refrained from applying the uniformity principle as a restriction upon the Congressional exercise of the commerce power. They have recognized that economic problems are practical problems, and that their solution often requires considerable latitude and flexibility. Accordingly, they have upheld numerous statutory schemes of far-reaching economic importance, involving incidental discrimination. Hirabayashi v. United States, 1943, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774; Detroit v. United States, 1943, 317 U.S. 329, 63 S.Ct. 297, 87 L.Ed. 304; Sunshine Anthracite Coal Co. v. Adkins, 1939, 310 U.S. 381, 60 S.Ct. 907, 84 L.Ed. 1263; Steward Machine Co. v. Davis, 1937, 301 U.S. 548, 57 S.Ct. 883, 81 L.Ed. 1279; District of Columbia v. Brooke, 1909, 214 U.S. 138, 29 S.Ct. 560, 53 L.Ed. 941.

The Labor-Management Relations Act of 1947 has, itself, withstood constitutional attack, although it provides exemptions for agricultural workers, domestic help, railway employees, employees of non-profit hospitals, employees of governmental instrumentalities, and supervisory employees. See: N. L. R. B. v. Edward G. Budd Manufacturing Co., 6 Cir., 1948, 169 F.2d 571; Brown v. Roofers & Waterproofers Union Local 40, D.C.N.D.Cal.1949, 86 F.Supp. 50.

 In dealing with Congressional enactments under the commerce clause, the Courts are dealing with a plenary power of the Congress, complete in itself, and, they must, and traditionally do, extend wide latitude. It is not for the Courts to supervise policy or the extent to which that policy should go. In this field the Congress need not deal at one time with all the evils it may observe. It may proceed by cautious advance, step by step. It may choose the commodities, industries and places with which it will deal. N. L. R. B. v. Jones & Laughlin Steel Co., 1937, 301 U.S. 1, 46, 57 S.Ct. 615, 81 L.Ed. 893; Currin

v. Wallace, supra; Sunshine Anthracite Coal Co. v. Adkins, supra; Hirabayashi v. United States, supra.

In the present situation, we are not inclined to assume that the language contained in the House Management Report (but not in the Senate Report or in the Act itself) represents the final view of the Congress.

Even if it did, there would still be a strong presumption that other reasonable considerations existed to support the exemption of the garment industry as distinguished from the lithographic industry. The garment industry exemption need not have been based solely upon the integrated nature of its work processes. Other economic and social circumstances peculiar to the garment industry may well have prompted the exemption. See e. g., Cong.Rec.Senate, Sept. 3, 1959, p. 1643, BNA, supra at 472.

 Therefore, we conclude that Section 8(e) must be deemed a valid Congressional exercise of the commerce power.

## VI.

### Discretion in Statutory Injunction Proceedings

The Court has carefully considered whether, upon finding "reasonable cause" to believe that respondents are in violation of Section 8(e), and that the violation is of a continuing nature, it has, nevertheless, a discretion with respect to issuance of a temporary injunction pending a final determination of the question by the NLRB which is the administrative agency charged by law with making the final decision.

Recognizing the possibility of an ultimate determination favorable to the party against whom a temporary injunction is sought and the possibility of irreparable injury by the issuance thereof, equity ordinarily vests a court with a certain discretion in granting or withholding temporary injunctions, enabling the Court to take into consideration the relative impact and injury as between the parties resulting from the temporary injunction.

In the present proceeding such discretion might ordinarily be influenced by the fact that the collective bargaining clauses here involved have been long, and until November 13, 1959, considered to be legal, Local 1976, United Brotherhood of Carpenters and Joiners of America, A. F. L. v. N. L. R. B., supra, and that the withholding of a temporary injunction would mean only that the charging employers, and other employers and employees affected, would continue for some months more, pending final adjudication by the NLRB, with practices to which management, whether willingly or not, and unions, have adjusted over a period of years.

Further, it appears from the evidence that on December 18th, during the pendency of this proceeding, but before the hearing, negotiating committees of the employers and the union had actually reached a settlement of the strike upon an agreement which would include the controversial clauses. The union membership, however, refused to approve that settlement upon other grounds, presumably economic.

What controversy still exists would probably be settled in due course to bring this strike to an end. Of course, proceedings would still remain pending before the Board to determine the legality of the controversial clauses.

A temporary injunction against inclusion of these clauses would not only suddenly upset an established and heretofore admittedly legal practice, but might also tend to prevent or delay, rather than further, a settlement.

From one point of view it might be argued that the public interest would for these reasons be served by withholding the relief sought in order to encourage a settlement and to preserve a status quo, albeit, a probably illegal status quo.

The NLRB, however, points out that, in fact, the continuance of a practice reasonably believed to be illegal, involves not only the employers and employees immediately concerned, but also other employers and employees affected in a manner which Congress has declared to be, not in, but against, the public interest.

The NLRB also points out that the Congress has prescribed a statutory scheme for dealing with situations of this kind, a procedure under which the Regional Director of the Board, upon finding "reasonable cause" to believe that a charge of unfair labor practice is true, "shall" petition the United States District Court for "appropriate injunctive relief."

We must pass then, to a consideration of the nature and extent of judicial discretion, permissible and proper in proceedings of this kind.

In Hecht Co. v. Bowles, 1944, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754, arising under a comparable statutory provision, Section 205(a) of the Emergency Price Control Act of 1942, 56 Stat. 23, 50 U.S.C.A.App.Supp. II, Sections 901, 925, the Supreme Court considered the refusal of a District Court to issue an injunction upon the ground that the injunction would be futile, unjust, and contrary to the public interest and held that the issuance of an injunction was not mandatory, but within the discretion of the Court.

Such discretion, however, said the Court, 321 U.S. at page 331, 64 S.Ct. at page 592, " * * * must be exercised in light of the large objectives of the Act. For the standard of public interest, not the requirements of private litigation, measure the propriety and need for injunctive relief in these cases."

The Supreme Court held in that case that the Court of Appeals, which had reversed the lower court upon the ground that an injunction should have issued as a matter of course, once violations were found, should be reversed, and the cause was remanded to the Court of Appeals with direction to determine whether the lower court, upon the record, had acted within or had abused its discretion.

Numerous courts, which have since been confronted with similar problems as to the exact scope of discretion,

available to District Courts upon petitions for temporary injunction pursuant to statutory provision, have accorded great respect to the legislative purpose, and have recognized the peculiar role of the District Court in the statutory scheme set up by Section 10($l$) of the N.L.R.B. Both the Board and the Court are charged with responsibility for fulfilling the Congressional purpose.

Most Courts, which have found "reasonable cause", have resolved discretion by issuing the temporary injunction. See: Cosentino v. United Brotherhood of Carpenters, A.FL-CIO, 7 Cir., 1959, 265 F.2d 327; Madden v. International Organization of Masters, 7 Cir., 1958, 259 F.2d 312; American Federation of Radio and Television Artists, AFL-CIO v. Getreu, 6 Cir., 1958, 258 F.2d 698; Douds v. International Longshoremen's Ass'n, 2 Cir., 1957, 242 F.2d 808; Schauffler v. United Association of Journeymen, etc., Local 420 AFL, 3 Cir., 1955, 218 F.2d 476; Brown for and on behalf of N. L. R. B. v. Pacific Telephone & Telegraph Co., 9 Cir., 1954, 218 F.2d 542; Le Baron v. Los Angeles Building Council, D.C.S.D.Cal.1949, 84 F.Supp. 629, affirmed 9 Cir., 1950, 185 F.2d 405; Douds v. Local 294, International Brotherhood of Teamsters, D.C.N.D.N.Y.1947, 75 F.Supp. 414.

In one case, the District Court, recognizing and acting upon a broad discretion, refused to issue the injunction, only to be reversed on the issue. In that case, Douds v. International Longshoremen's Ass'n, supra, Judge Medina said [242 F.2d 811]: "The injunction is an integral part of the procedure established by the Congress to prevent the continuance of an unfair labor practice" and "It was not for the District Court to pass upon the 'public interest or necessity.' These matters had already been decided by the Congress when it passed the Act."

Similarly, in Brown v. Pacific Telephone & Telegraph Company, supra [218 F.2d 544], the court held that the District Court's denial of a temporary injunction to prevent employers from dealing with a bargaining unit other than the one designated by the NLRB, could not be upheld upon the theory that such denial was within the sound judicial discretion of the Court, and the denial of the injunction was reversed. Judge Pope, concurring, said: "However valid this contention might be were we dealing here with private rights in private litigation, I think that since this injunction is sought for the protection of the public interest and in aid of a policy which Congress itself has made plain, the area for the exercise of the traditional discretion not to grant an injunction is much more limited." Citing Hecht Co. v. Bowles, supra.

In Elliot v. Amalgamated, D.C.W.D. Mo.1950, 91 F.Supp. 690, the District Court recognized a broad discretion but also failed to find that there was "reasonable cause" to believe that there was an unfair labor practice. See also, Alpert v. United Steel Workers, D.C.D. Mass.1956, 141 F.Supp. 447; Brown v. Retail, D.C.N.D.Cal.1950, 89 F.Supp. 207 where the issue was resolved by the failure to find "reasonable cause."

In Schauffler v. United Association of Journeymen, etc., supra, and Consentino v. United Brotherhood of Carpenters, supra, considerable discretion on the part of the court in determining the nature and scope of the injunctive relief decreed was recognized and approved.

In no instance, however, has a court, finding "reasonable cause" to believe that there has been a violation, and that the violation is of a continuing nature, been sustained in its denial of the injunction upon discretionary considerations concerning its conception of what might or might not be in the public interest notwithstanding the violation.

 On the contrary, there seems to be general agreement that this statutory proceeding for a temporary injunction is an integral part of the procedure established by Congress to prevent the continuance of an unfair labor practice; further, that it is not the function of the District Court to determine what is, or what is not, in the public interest, a mat-

ter already decided by the Congress when it passed the statute.

It is important to note that in the Senate Report, on the Bill, which ultimately included Section 10($l$) of the Act, the Congressional purpose and intent concerning the temporary injunction procedure is made clear. That report stated:

> "* * * Because of the nature of certain of these practices especially jurisdictional disputes, and secondary boycotts and strikes for specifically defined objectives, the committee is convinced that additional procedures must be made available under the National Labor Relations Act in order adequately to protect the public welfare which is inextricably involved in labor disputes.

> "Time is usually of the essence in these matters, and consequently the relatively slow procedure of Board hearing and order, followed many months later by an enforcing decree of the circuit court of appeals, falls short of achieving the desired objectives—the prompt elimination of the obstructions to the free flow of commerce and encouragement of the practice and procedure of free and private collective bargaining * *." S.Rep. No. 105, 80th Cong., 1st Sess. p. 8.)

The Court, therefore, concludes that while it must carefully test for "reasonable cause," it should be guided by the "statutory yardstick," Madden v. International Organization of Masters, supra, and should resolve such doubts as it may have in the exercise of its discretion, in favor of effectuating in this case the intent and purpose of the Congress both with respect to the new substantive secondary boycott provisions and the procedural temporary injunction provisions of Section 10($l$).

## VII.

*Conclusions*

The case having been submitted for decision by all parties, the Court concludes, subject to the preparation by petitioner, and service on respondents, of further proposed findings, conclusions, decree, and writ, and settlement and signing thereof by the Court, that respondents' pending motion to dismiss should be, and the same is hereby, denied; and, that a decree should be entered herein:

1. Enjoining respondents herein, pending further proceedings before the National Labor Relations Board, from entering into any agreement, express or implied, with the lithographic employer members of the Association, or with any of the so-called independent lithographic employers, in the terms of, or substantially similar thereto, those clauses herein referred to as the "Trade Shop" clause and the "Refusal to Handle" clause; or, in the the terms of, or substantially similar thereto, those clauses herein referred to as the "Struck Work" clause, the "Chain Shop" clause, and the "Termination" clause, unless with respect to the last three mentioned clauses clarification and revision is made and approved by the Court.

2. Enjoining respondents from engaging in, inducing, or encouraging any individual employed by any employer members of the Association or of the independent lithographic employers, heretofore mentioned, to engage in a strike or a refusal in the course of his employment, or to threaten, coerce, or restrain any person engaged in the lithographic industry, whether in the commerce of the employers' Association or the independent lithographic employers, where in either case an object thereof is to force or require any such employer to enter into any agreement containing the terms of, or substantially similar thereto, the clauses above mentioned.

3. Reserving in the Court power to terminate, modify, alter, amend, supplement, or otherwise change any temporary injunction issued herein, upon such further hearing and notice as the Court deems proper, and particularly, to consider and determine further clarification or revision of the "Struck Work"

clause, the "Chain Shop" clause, and the "Termination" clause.

It is ordered that petitioner's motion for temporary injunction, pursuant to Section 10(*l*) of the Act, pending final adjudication before the Board, is hereby granted as above set forth.