309 F.2d 31
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
AMALGAMATED LITHOGRAPHERS OF AMERICA (IND.) and Local No. 17
of theAmalgamated Lithographers of America (Ind.),
Respondents, Lithographers andPrinters National Association,
Employing Lithographers Association, a Divisionof the
Graphic ArtsEmployers Association, Intervenors.
 No. 17410.
 United States Court of Appeals Ninth Circuit.
 Aug. 31, 1962, Rehearing Denied Nov. 9, 1962.
 
 Stuart Roghman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Samuel M. Singer, and Morton Namrow, Attys., Washington, D.C., for petitioner.
 
 
 1
 Robinson, Silberman, Pearce & Aronsohn, Benjamin M. Robinson, Matthew Silverman, and Leonard B. Sand, New York City, for respondents, Amalgamated Lithographers of America (Ind.) and Local 17, Amalgamated Lithographers of America (Ind.).
 
 
 2
 Garry, Dreyfus, McTernan & Keller, and Francis J. McTernan, San Francisco, Cal., for respondent, Local 17, Amalgamated Lithographers of America (Ind.).
 
 
 3
 Helen F. Humphrey, Washington, D.C., for intervenor Lithographers & Printers Nat. Assn. Inc.
 
 
 4
 Littler, Mendelson, & Saltzman, and Robert Littler, San Francisco, Cal., for intervenor Employing Lithographers, a Div. of Graphic Arts Employers Assn.
 
 
 5
 Before HAMLEY, HAMLIN and BROWNING, Circuit Judges.
 
 
 6
 HAMLEY, Circuit Judge.
 
 
 7
 The National Labor Relations Board has petitioned this court for enforcement of its order entered against respondent unions, and reported in 130 NLRB (102) 985.[1] Two employer-groups were intervenors in the Board proceeding and have been permitted to intervene here.[2]
 
 
 8
 The primary question presented is whether certain clauses which the unions sought to have included in collective bargaining agreements are 'hot cargo' clauses proscribed by section 8(e) of the National Labor Relatins Act, and amended (Act), 29 U.S.C.A. 158(e).[3] Finding that they were unlawful, the Board concluded that the unions violated section 8(b)(4)(A) and (B) of the Act, 29 U.S.C.A. 158(b)(4)(A) and (B), by striking and invoking an overtime ban to obtain such clauses.
 
 
 9
 The Board further found that the unions, by resorting to these pressures and insisting upon the inclusion of the clauses, refused to bargain in good faith in violation of section 8(b)(3), 29 U.S.C.A. 158(b)(3). Finally, the Board found that the unions violated section 8(e), by entering into agreements with certain employers reinstating an expired collective bargaining contract containing clauses of this kind.
 
 
 10
 Consistent with these finding the Board ordered the unions to cease and desist from such practices and to post notices and take other affirmative action of a kind which is customary in such cases.
 
 
 11
 Local 17 is the bargaining representative of lithographic employees who work for the fifteen employer-members of the Association. It also represents the lithographic employees of more than a hundred other employers in Northern California, herein called 'independents', who are not members of the Association, Among these Independents are Schwabacher-Frey Co., Neal Stratford & Kerr, Merrill Reed Lithographers, and Hogan-Kaus Lithograph Co., herein called Schwabacher, Neal, Merrill and Hogan. There are also additional lithographic employers in Northern California who are not members of the Association but with whom members transact business. The employees of this group of employers are unorganized or are represented by other unions not involved in this proceeding.
 
 
 12
 Under customary procedure, Local 17, with the approval of the International, first negotiates a 'master agreement' with the Association. It then executes separate contracts with each Independent adopting the provisions of the master agreement. The most recent master agreement was one which became effective on October 22, 1957, subject to termination on October 18, 1959, upon sixty days' notice.
 
 
 13
 This contract contained clauses relating to struck work and trade shops which were lawful at the time the contract was executed. On September 14, 1959, however, the Labor-Management Reporting and Disclosure Act of 1959 (Landrum-Griffin Act) was enacted amending, effective November 13, 1959, section 8 of the Act. Section 8(e), thereby added to the Act, had the effect, as respondents concede, of invalidating the indicated clauses of the 1957 agreement as of November 13, 1959.
 
 
 14
 About August 17, 1959, Local 17 advised the Association and each Independent of its desire to terminate the existing agreement on October 18, 1959. At the same time Local 17 requested that representatives of the Association meet with it in order to negotiate a new contract. Negotiations between the parties were initiated on September 9, 1959, and about sixteen meetings between Local 17 and the Association were thereafter had.
 
 
 15
 Commencing about October 12, 1959, Local 17 with the authorization and approval of the International, demanded that the Association agree to inclusion in the new contract of the five clauses which the Examiner and Board later found to be illegal 'hot cargo' clauses. The Association refused to agree to these contract demands. Thereafter the parties were concerned in their negotiations with two principal items, a raise in wages for the employees, and these contract clauses demanded by the unions.
 
 
 16
 On October 18, 1959, Local 17 instituted a ban on overtime work. Negotiations finally reached an impasse on November 20, 1959, and three days later the unions instituted a strike. On or about November 21, 1959, Schwabacher, Neal, Hogan and Merrill, and some other Independents entered into agreements with Local 17 whereby they were permitted to continue operations pending the negotiation of a new contract with the Association.
 
 
 17
 The NLRB proceedings were instituted on October 26, 1959. On December 7, 1959, the Board's regional director, pursuant to section 10(l) of the Act, 29 U.S.C.A. 160(l), instituted injunction proceedings in the District Court for the Northern District of California, Southern Division. On January 13, 1960, the district court filed a decision finding the strike unlawful, ordering a temporary injunction, and requesting the regional director to submit a form of findings, conclusions, decree and writ.[4] The general counsel of the Board submitted such forms but the unions objected to them and no final decree was ever entered. On January 30, 1960, respondents and the Association agreed upon terms of a new collective bargaining contract and the strike was terminated.
 
 
 18
 We first consider the union's contention that the Board erred in finding and concluding that the five questioned clauses which the union sought to have included in the new agreement were proscribed by section 8(e) of the Act.
 
 
 19
 The first of these is the 'trade shop' clause, set out as section 22 of the contract tendered by the unions.[5] The Board found and concluded that this clause constitutes an implied agreement that the employer will not handle any non-union work.
 
 
 20
 Respondents do not deny that if the trade shop clause constitutes an implied agreement of that kind, it is proscribed by section 8(e) quoted in note 3 above. They argue, however, that the clause leaves it completely to the discretion of the employer whether he wants to handle the work of a non-union shop, there being no provision of the clause which expressly or by implication requires him to refrain from doing business with such a shop.
 
 
 21
 Respndents recognize that, in the event the employer does do business with a non-union shop, the clause in question entitles the unions to reopen the entire contract for negotiations, and to terminate the contract if agreement is not reached within ten days. But respondents contend that these provisions have only an incidental effect upon the course an employer may choose in regard to handling non-union work or dealing withe non-union employees, and do not amount to an implied agreement of the kind found by the Board.
 
 
 22
 Moreover, respondents argue, the trial examiner rejected their offers of proof which would have established that the purpose of the clause was not to forbid employers from dealing with non-union shops, but to enable the unions to reassess their economic demands in the event the employer followed such a practice. Thus, respondents argue, a change of this kind in the employer's method of operation would require new contractual arrangements covering such matters as increased wages or decreased hours of work in the light of the employer's increased profits, modification of apprentice ratios, establishment of an out-of-work fund, and revisions in the jointly-administered pension plan.
 
 
 23
 Under the trade shop clause in question, the entire contract is predicated on the assumption that the employer will not handle any non-union goods. The employer agrees that he will deal with non-union employers only at the risk of giving up all of his benefits under his contract. In our opinion this provision and the 'refusal to handle' clause discussed below, considered together, amount to an implied agreement not to deal with such employers.
 
 
 24
 The proffered evidence which was rejected by the trial examiner tended to show that it was economically advantageous for the union to have employers refrain from dealing with non-union employers. But the prohibition of section 8(e) is a broad one. Agreements of this kind, whether express or implied, are not made lawful by economic necessity.
 
 
 25
 We conclude that the Board did not err in finding and concluding that the trade shop clause is proscribed by section 8(e) of the Act. In this regard we are in agreement with the view expressed in Employing Lithographers of Greater Miami, Florida v. N.L.R.B., 5 Cir., 301 F.2d 20; and Brown v. Local No. 17, Amalgamated Lithographers, D.C.N.D. Cal., 180 F.Supp. 294, 302-303.
 
 
 26
 The second questioned clause is the 'struck work' clause, which appears as section 23(a) of the contract tendered by the unions.[6] The Board found and concluded that this clause constitutes an implied agreement that the employer will not handle any work for any struck plant.
 
 
 27
 Respondents do not contend that an employer and a union maylawfully agree that the employer will not render any assistance to another employer whose jplant is struck by the union. This is forbidden by section 8(e) of the Act. But they argue that the particular clause here in question merely embodies the socalled 'ally' doctrine established by Douds v. Metropolitan Federation of Architects, S.D.N.Y., 75 F.Supp. 672, and N.L.R.B. v. Business Machine and Office Appliance Mechanics, etc., 2 Cir., 228 F.2d 553.
 
 
 28
 In these decisions it was held that an independent employer loses his neutral position and becomes an ally of a struck employer if he performs so-called 'farmed out' work. 'Farmed out' work is that which the struck employer would ordinarily perform but is unable to perform because of the labor dispute. In such situation the picketing of the ally is permissible because such employer 'knowingly does work which would otherwise be done by the striking employees of the primary employer.' N.L.R.B. v. Business Machine and Office Appliance Mechanics, above, at page 559.
 
 
 29
 The Board agrees that the 'ally' doctrine remains in effect notwithstanding the enactment of section 8(e) in 1959. But it argues that the literal language of the proposed struck work clause goes beyond the permissible limits of the ally doctrine and, therefore, that the Board's finding as to the illegality of the clause is reasonable and proper. The same view was expressed concerning this identical clause in Brown v. Local No. 17, D.C., 180 F.Supp. 294, at 300-301.
 
 
 30
 The clause in question has two parts. The first of these is a general statement that the employers will not render assistance to any lithographic employer, any of whose plants are struck by any Local or the International or where members of any such Local or the International are locked out. The second part is an implementation clause which provides that in carrying out the purpose expressed in the general statement the employees shall not be requested to handle any lithographic work (other than work actually in process in the plant) 'customarily produced by such employer.'
 
 
 31
 Respondents do not deny that if the general statement stood alone it would be unlawful because it embodies more than the ally doctrine. But they contend that the general statement must be read together with, and in the context of, the implementation clause, and that so reading the entire clause it embraces nothing more than the ally doctrine.
 
 
 32
 We do not understand that the Board objects to reading the general statement in the light of the implementation clause. In fact that is exactly the technique the Board followed in the Miami case, Amalgamated Lithographers of America and Local 78, 130 NLRB (107) 968, 974. It was there held that although the general statement in the struck work clause was as broad as in the case before us, the entire clause, read in the light of the implementation language there used, embodied no more than the 'ally' doctrine.[7] But the Board believes that the implementation language in the struck work clause before us does not limit the clause as a whole to an application of the ally doctrine.
 
 
 33
 In reaching this conclusion the Board construes the words 'such employer,' at the end of the implementation language, as referring to the 'Employers,' referred to at the beginning of the struck work clause. The latter are contracting parties to the collective bargaining agreement. So reading the words 'such employers' the Board was led to conclude that the struck work clause '* * * would have precluded Association members from doing not only 'farmed-out' work which the struck employer normally performs, but also work customarily performed for him by another employer.'
 
 
 34
 In our opinion this represents a patent misconstruction of the clause. At the outset, the struck work clause identifies employer parties to the contract as the 'Employers,' (capitalized and in the plural). The clause refers to a struck employer (not a contracting party) as 'any lithographic employer' (not capitalized and in the singular). With these antecedents it is evident to us that the closing words of the clause, 'customarily produced by such employer,' apply to a struck employer and not to 'Employers' who are contracting parties.
 
 
 35
 If the words 'such employer' at the end of the clause are construed to mean a contracting Employer, then the effect would be to relieve employees from doing lithographic work which a contracting Employer 'customarily' does for a struck plant, but not to relieve such employees from doing lithographic work which a contracting Employer does for a struck plant only because such work is 'farmed out' as a result of the strike. This would be exactly opposite from the purpose of such a clause, namely to prevent a contracting Employer from becoming an ally of a struck plant.
 
 
 36
 It would have been better if the words 'such employer' had been expressly defined by adding thereto, as in the struck work clause involved in the Miami case, the words 'involved in such strike or lockout.' Nevertheless, and for the reasons stated above, we believe that the words, as used in the clause before us, could only refer to a struck employer.
 
 
 37
 As so read, the clause embodies only the ally doctrine. Employees are to refrain from handling lithographic work 'customarily produced by such (struck) employer.' This is the work which would be farmed out. They are left free to perform work which the contracting employer normally does for the struck employer.
 
 
 38
 Unlike the Fifth Circuit in the Miami case, we do not believe that the technique of reading the broad general statement of the struck work clause in the light of the implementation language, is 'rewriting' the contract for the parties. All of the language of the clause is theirs. Our only problem is to determine the meaning of the words they have used. Since the clause as construed above manifests the intention that it be implemented only to the extent permissible under the ally doctrine, it is reasonable to conclude that this is the only purpose of the clause.
 
 
 39
 We hold that the Board erred in finding and concluding that the struck work clause proposed by respondents is proscribed by section 8(e) of the Act.
 
 
 40
 The third questioned clause is the 'chain shop' clause which appears as section 23(b) of the contract tendered by the unions.[8] The Board held that tis clause 'standing by itself,' is unlawful, because it permits a kind of strike which is unlawful under section 8(b)(4) of the Act.[9] The complete statement of the Board's reasoning in reaching this conclusion is quoted in the margin.[10]
 
 
 41
 The chain shop clause, 'standing by itself' does not have anything to do with strikes or other coercive action. It provides only that the primary employer shall not request his employees to do certain work. However, reading that clause in conjunction with another of the questioned clauses (section 24, 'Termination')[11] it is fair to say that the primary employer agrees to a strike as an ultimate sanction if, in the breach of the chain shop clause, he requests his employees to do work proscribed under that clause.
 
 
 42
 But the fact that a strike or other coercive activity of the kind described in section 8(b)(4) is for an objective there made unlawful does not of itself render unlawful a contract whereby the employer agrees to voluntarily act in such manner as would accomplish such an objective. This was settled in Local 1976, United Brotherhood of Carpenters and Joiners of America v. N.L.R.B., 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186.[12]
 
 
 43
 It follows that if the chain shop clause is unlawful it must be because some provision of the Act other than section 8(b)(4)(A) and (B) makes it so. Neither the Board nor the trial examiner cited any other section in support of this view, nor has counsel for the Board in this review proceeding. In its brief in this court, however, counsel for the Board has characterized the chain shop clause in such manner as to indicate that the Board believes the clause to be violative of section 8(e). The language to which we have reference is quoted in the margin.[13]
 
 
 44
 The section 8(e) is the authority relied upon in holding such a clause unlawful is more clearly indicated by the position taken by the Board's counsel in the Board proceedings in the Miami case. As stated by the Board in its decision in that case (130 N.L.R.B. (No. 107) 968, 973), the general counsel there contended that the chain shop and other clauses '* * * are illegal in that they would require employers to cease or refrain from, or agree to cease or refrain from, handling, using, selling, transporting, or otherwise dealing in the products of other employers or to cease doing business with other persons within the meaning of Section 8(e) of the Act. * * *'[14]
 
 
 45
 Section 8(e) of the Act, quoted in note 3, makes it an unfair labor practice for a union and a primary employer to enter into an agreement whereby such employer ceases or refrains, or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person.
 
 
 46
 On the other hand, the chain shop clause here in question is not an undertaking by a primary employer not to handle the work of another employer. It constitutes only an agreement by a primary employer not to request his employees to handle his own work in any of his plants, if, in another of his plants, or in a plan of his subsidiary, any local of the International, or the International, is on strike or members thereof are locked out. Assuming that a 'subsidiary' within the meaning of the chain shop clause could be an 'other' person or employer within the meaning of section 8(e), there is nevertheless lacking in this clause any agreement not to handle the work of that 'other' person or employer.
 
 
 47
 It is true that if the primary employer is ever called upon to honor the chain shop agreement, his own work which he must then not request his own employees to perform might include some work which he customarily does for the 'other' person or employer, if the 'subsidiary' is deemed to be such. But the thrust of the clause is not to bind the employer to cease handling the word of other persons or employers, and if this actually occurred in a particular case, the employer has an effective remedy under section 10(a) 29 U.S.C.A. 160(a).
 
 
 48
 The legality of a contract clause was involved in only one of the four cases cited by the Board in support of its view that a 'subsidiary' may be an 'other' employer within the meaning of the Act. This was the situation in the Miami case, referred to above (Employing Lithographers of Greater Miami, Florida v. N.L.R.B., 5 Cir., 301 F.2d 20), wherein the proposition that a chain shop clause of this kind would be unlawful under section 8(e) was assumed but not discussed. In the other three cases,[15] the question arose not in considering the legality of a contract clause, but in determining whether coercive union action in a particular concrete situation was an unfair labor practive. Section 8(e) was not involved in any of those three cases.
 
 
 49
 It is therefore our opinion that since it is not the purpose of this chain shop clause to contractually bind a primary employer not to handle the work of another person or employer, the clause is not unlawful under section 8(e), even assuming that a 'subsidiary' of the primary employer may be an 'other' employer. Since there is no other provision of the Act making such an agreement unlawful we conclude that the Board erred in finding and concluding that the chain shop clause is unlawful.
 
 
 50
 The fourth questioned clause is the 'termination' clause, quoted in note 11.[16] The Board found and concluded that, considered in context with the other questioned clauses, the termination clause:
 
 
 51
 '* * * is the sanction intended to insure that the contracting employer will not handle certain 'hot goods.' As a component part of the implied agreement to achieve an illegal objective, it partakes of that illegality.'
 
 
 52
 This clause implements section 23 of the proposed agreement, which contains the struck work clause (a) and the chain shop clause (b). Respondents argue that if section 23 is legal there is no problem with respect to the termination clause insofar as it relates to section 23.
 
 
 53
 We have held that neither the struck work clause nor the chain shop clause is unlawful. In validating the struck work clause, however, we have construed it as applying only with regard to struck work which is not customarily handled by the primary employer. But this termination clause is not so limited. It applies with regard to 'any' work received from or destined for any employer involved in a strike or lockout of the kind referred to in section 23 of the proposed agreement, whether such work was 'customary' or 'farmed out' work.
 
 
 54
 Since it is unlawful under section 8(e) for an employer to agree that he will refuse to handle work of another employer which he customarily handles, this termination clause is unlawful. The Board did not err in so finding and concluding.
 
 
 55
 The final questioned clause is the so-called 'refusal to handle' clause, contained in section 25 of the proposed agreement.[17] The Board found and concluded that this clause is unlawful for the same reason that it determined the termination clause to be unlawful.
 
 
 56
 Respondents argue that the refusal to handle clause merely preserves to the individual the option to handle or refuse to handle certain work. They argue that the Act is not intended to impinge upon the right of an employee to determine for himself whether he would handle hot cargo.
 
 
 57
 In our view it was not unreasonable for the Board to conclude that this clause constitutes a sanction available to the union to enforce the trade shop and termination clauses which we have held to be unlawful under section 8(e). We therefore hold that the Board did not err in making this determination.
 
 
 58
 Respondents further argue that even if any or all of the clauses discussed above are unlawful, the Board erred in finding and concluding that respondents' strike and ban on overtime work, in connection with their efforts to obtain a collective bargaining agreement to their liking, were unfair labor practices.
 
 
 59
 The Board held that the strike and overtime ban were for the purpose of securing agreement on these clauses. It concluded therefrom that since, in its view, those clauses are unlawful, the strike was an unfair labor practice under section 8(b)(3) and (b) 4(A) and (B), and the overtime ban was an unfair labor practice under section 8(b)(3).
 
 
 60
 Section 8(b)(3) provides that it is an unfair labor practice for a labor organization or its agents to refuse to bargain collectively with an employer. A labor organization which insists upon the inclusion of illegal contract provisions refuses to bargain collectively within the meaning of section 8(b) (3). International Typographical Union Local 38, etc. v. N.L.R.B., 1 Cir., 278 F.2d 6, 12, rev'd in part and aff'd in part by an equally divided Court, 365 U.S. 705, 81 S.Ct. 855, 6 L.Ed.2d 36 (reversal and Court division on the question of the legality of the contract provisions involved). Section 8(d) requires the parties to collective bargaining to meet and confer in good faith. Either party's insistence upon contract provisions known by him to be unlawful is evidence of a desire not to reach an agreement.
 
 
 61
 Even though the offending party's view of the law is honestly mistaken, however, his good faith is not available as a defense to a charge of refusal to bargain. Old King Cole, Inc. v. N.L.R.B., 6 Cir., 260 F.2d 530.[18]
 
 
 62
 Therefore a strike or an overtime ban to obtain an agreement which is unlawful under section 8(e) is an unfair labor practice under section 8(b)(3) pertaining to refusals to bargain collectively.
 
 
 63
 A strike or other coercive action to obtain a contract clause which is unlawful under section 8(e) is also an unfair labor practice under the express language of section 8(b)(4)(A).[19]
 
 
 64
 Respondents do not dispute the view just expressed that a strike or overtime ban to secure agreement on unlawful clauses is an unfair labor practice. But they assert that the evidence does not support the Board finding that this was the purpose of the strike and ban.
 
 
 65
 Respondents call attention to evidence indicating that, in addition to the negotiations concerning these clauses, there were continuous and serious negotiations concerning wages and other economic features of the contract, and that the parties never reached agreement as to these other matters. Additional items of evidence relied upon as showing that the strike and ban were not for the purpose of obtaining agreement on the clauses, are referred to in the margin.[20]
 
 
 66
 On the other hand, there was evidence that at the very outset of the negotiations of the 1959 contract, respondents made it clear that the questioned clauses would have to be incorporated in the new contract. The employers were told that the unions regarded these clauses as 'the lifeblood of the organization,' and that they had been drawn by counsel for the International and had to be accepted without change.[21] On October 188 1959, the employers were warned by letter that they had three days in which to accept an enclosed new contract containing the clauses or else a ban on overtime work would be instituted. On November 20, 1959, the president of Local 17 made the statement that the proposals 'had to be in the contract or there would be no contract.' The strike commenced three days later.
 
 
 67
 The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole are conclusive. Section 10(e) of the Act, 29 U.S.C.A. 160(e); Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 491, 71 S.Ct. 456, 95 L.Ed. 456. Our review of the record convinces us that, applying this test, the Board did not err in finding that one of the objects of the strike and overtime ban was to secure incorporation of the clauses in dispute in any new collective bargaining agreement.[22]
 
 
 68
 In order to hold that a strike or other coercive action is an unfair labor practice under section 8(b)(4), it is not necessary to find that the sole object thereof was one which is prohibited by that statutory provision. N.L.R.B. v. Denver Bldg. & Const. Trades Council, 341 U.S. 675, 689, 71 S.Ct. 943, 95 L.Ed. 1284. It is sufficient if one of its objects is unlawful. Dept. & Specialty Store Employees' Union, etc. v. Brown, 9 Cir., 284 F.2d 619, 628. We think the same rule should apply in determining whether a labor organization has refused to bargain collectively within the meaning of section 8(b)(3) and (d).
 
 
 69
 We therefore hold that the Board did not err in concluding, on the facts properly found, that respondents engaged in unfair labor practices in instituting the strike and overtime ban against these employers.
 
 
 70
 The Board agreed with the trial examiner that respondents violated section 8(e) of the Act in signing extension agreements with certain Independents. This transaction has reference to a stipulation of agreement which Schwabacher, Neal, Merrill and Hogan, as well as other Independents, executed on or about November 21, 1959. Thereafter, their operations were continued in exactly the same manner as they were conducted before the expiration date of the 1957 agreement.
 
 
 71
 Under this stipulation the parties agreed that there would be no work stopage at the plants of those signing the instrument '* * * since the under-signed parties have agreed to sign and comply with any and all conditions that will be negotiated by and between Local #17 * * * and the Employing Lithographers Association of San Francisco.' In a letter transmitting this form of stipulation to the Independents, the president of Local 17 advised that those signing the agreement 'may continue to work under the conditions of the master agreement (of 1957). * * *' It is conceded that the 1957 agreement contained struck work and trade shop clauses (in different form than the clauses proposed during the 1959 negotiations) which were rendered unlawful under section 8(e) enacted in 1959.
 
 
 72
 In the proceedings before the trial examiner the president of Local 17 testified that the reason the stipulation was sent to the Independents was that the union wanted to be sure that those companies would be under contract, 'namely, the economic part of the contract, and a guarantee of retroactive pay, and then they could continue to work.' This testimony was excluded on the ground that it did not tend to show the actual intention of the parties.
 
 
 73
 Respondents argue that the trial examiner erred in excluding this evidence because it tended to explain the 'ambiguous' letter of transmittal referred to above. They contend that, with this testimony in the record it would be established that the only part of the 1957 agreement which was extended for the Independents by operation of this stipulation was that having to do with economic conditions. On such a factual premise, respondents assert, the Board erred in concluding that extension of the 1957 agreement as to some Independents violated section 8(e).
 
 
 74
 The exceptions filed by respondents to the intermediate report of the trial examiner have not been made a part of the record before us. Accordingly, we do not know whether respondents urged, before the Board, the asserted error of the trial examiner in excluding the testimony of the president of Local 17, referred to above.[23] However, assuming that they did, we do not believe that the trial examiner erred in this regard. The letter of transmittal is not ambiguous in the respect claimed. Moreover, the testimony excluded did not tend to establish the mutual intention of the parties, but only an undisclosed intention of the unions.
 
 
 75
 Absent that testimony the Board did not err in finding that the stipulation as explained by the letter of transmittal, bound the signing Independents to all provisions of the 1957 contract, including the admittedly unlawful clauses. It was therefore not unreasonable for the Board to conclude that the stipulations effectuated an extension of agreements which, in 1959, became unlawful under section 8(e).
 
 
 76
 Finally, respondents argue that the exemption of the apparel and clothing industry from the application of section 8(b)(4)(B) and (e), accomplished by a proviso in section 8(e), is arbitrary and capricious and thereby renders section 8(b)(4) and (e) void as discriminatory class legislation contrary to the due process clause of the Fifth Amendment.
 
 
 77
 For the reasons stated in Employing Lithographers of Greater Miami, Florida, v. N.L.R.B., 5 Cir., 301 F.2d 20, 24-27, and Brown v. Local No. 17, Amalgamated Lithographers of America, D.C., 180 F.Supp. 294, 305-306, we hold that section 8(b)(4) and (e) of the Act are not void under the Fifth Amendment.
 
 
 78
 The Board order under review, and the form of notice therein required to be posted, are stated in general terms. They do not make reference to the particular contract clauses which have been under discussion in this opinion. They require only that respondents cease and desist from activity designed to force or require the employers to enter into any agreement which is prohibited by section 8(e), or forcing or requiring the employers to cease handling the products of or cease doing business with any other person.
 
 
 79
 Having held that the trade shop, termination, and refusal to handle clauses are unlawful; that the Board did not err in finding and concluding that the object of the strike and overtime ban was to obtain agreement on these clauses; and that the Board did not err in finding and concluding that respondents violated section 8(e) in signing extension agreements with certain Independents, we affirm the order in its present form and will enter a decree enforcing the same. In complying with that order, however, it is to be understood, consistent with this opinion, that the struck work and chain shop clauses proposed during the negotiations in the fall of 1959, discussed above, are not unlawful, and that union insistence thereon will not violate such Board order as hereby affirmed.
 
 
 
 [1]
 The respondents are Amalgamated Lithoraphers of America (Ind.) herein called 'International,' and Local No. 17 of the Amalgamated Lithographers of America (Ind), herein called 'Local 17.'
 
 
 [2]
 The intervenors are Lithographers and Printers National Association, Inc., and Employing Lithographers, a division of the Graphic Arts Employers Association, herein called 'Association.'
 
 
 [3]
 Section 8(e) reads as follows:
 '(e) It shall be an unfair labor practice for any loabor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business withany other personAnd any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void: Provided, That nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work: Provided further, That for the purposes of this subsection and subsection (b)(4)(B) of this section the terms 'any employer', 'any person engaged in commerce or an industry affecting commerce', and 'any person' when used in relation to the terms 'any other producer, processor, or manufacturer', 'any other employer', or 'any other person' shall not include persons in the relation of a jobber, manufacturer, contractor, or subcontractor working on the goods or premises of the jobber or manufacturer or performing parts of an integrated process of production in the apparel and clothing industry: Provided further, That nothing in this subchapter shall prohibit the enforcement of any agreement which is within the foregoing exception.'
 
 
 [4]
 Brown v. Local No. 17, Amalgamated Lithographers, D.C., 180 F.Supp. 294
 
 
 [5]
 'Section 22. Trade Shop Work: (a) The parties agree that all the terms of this contract have been negotiated on the assumption that all lithographic production work will be done under approved union wages and conditions. In the event any employer covered by this contract requests any employee to handle any lithographic production work made in any shop which was not under contract with the Amalgamated Lithographers of America and authorized to use the union label of the Amalgamated, then the Union in its discretion by notice in writing, may re-open the contract as to that employer for negotiations as to the whole or any part thereof. In the event of failure to agree on all terms within ten days after such reopening, the Union shall have the right to terminate the contract forthwith as to that employer by giving written notice to such employer
 '(b) Union trade shops must affix the Union label on all their products before sending them to any other shop.
 '(c) Finished lithographic press plates which are sent out of any plant (unless for regraining) shall have the Union label and the name of the plant in the plate, except that as to plates heretofore made this may be done by otherwise attaching the Union label and name of the plant to the plate. Any negatives or positive sent out of a plant shall bear the Union label and the name of the plant.
 '(d) Upon request by the shop delegate an employer shall advise him of the source of any lithographic work brought into the plant from the outside. Such request shall not interfere withthe normal production of the plant.'
 
 
 [6]
 'Section 23. Struck Work: (a) The Employers agree that they will not render assistance to any lithographic employer any of whose plants is struck by any Local of the Amalgamated Lithographers of America or the International or where members of any such Local or the International are locked out, and accordingly agree that in implementation of this purpose the employees covered by this contract shall not be requested to handle any lithographic work (other than work actually in process in the plant) customarily produced by such employer.'
 
 
 [7]
 In reviewing that provision of the Board order, the Fifth Circuit disapproved of this technique in construing the struck work clause there in issue. That court held, in effect, that the general statement standing alone was unlawful and that such 'illegality' could not be removed by the implementation language as this would be rewriting the contract for the parties. 301 F.2d 20, at page 28
 
 
 [8]
 'Section 23 * * * (b) (Chain Shop) The Employers agree that the employees covered by this contract shall not be requested to handle any work in any plant if in another plant of any employer or any subsidiary of such employer in any part of the United States or Canada or any Local of the Amalgamated Lithographers of America or the International is on strike or members of such Local or International are locked out.'
 
 
 [9]
 Section 8(b)(4), 29 U.S.C.A. 158(b)(4) contains subparagraphs (A) through (D), followed by two provisos. The Board decision, briefs herein, and the cited cases indicate that only section 8(b)(4)(A) and (B) are relevant to the question before us. This part of the section reads as follows:
 '(b) It shall be an unfair labor practice for a labor organization or its agents--
 '(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is--
 '(A) forcing or requiring any employer or self-employed person to join any labor or employer organization or to enter into any agreement which is prohibited by subsection (e) of this section;
 '(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing; * * *'
 
 
 [10]
 'We also find, contrary to the Respondents' contention, that the 'chain shop' clause standing by itself is unlawful. It not only permits a sympathy strike in one plant of an employer where another plant of the same employer is struck, but also permits a strike in the plant of the principal company where the plant of a subsidiary is struck or vice versa, even though the principal and subsidiary do not constitute a single employer within the meaning of the Act. The latter type of strike is unlawful under Section 8(b)(4). / 12/ (12 Roy (& Sons Co.) vs. N.L.R.B., 251 F.2d 771 (C.A. 1); Bachman (Mach. Co.) vs. N.L.R.B., 266 F.2d 599 (C.A.8).) However the strike be labeled, 'sympathy' or otherwise, the effect of the 'chain shop' clause is exactly like that of the 'struck work' clause, at least insofar as company and subsidiary are separate employers within the meaning of the Act.'
 
 
 [11]
 'Section 24. Termination: In the event an employer requests any employee to handle any work described in paragraph (Section 23) above, or requests an employee to handle any work received from or destined for any employer involved in such strike or lockout, directly or indirectly (other than work actually in process in the plant), the Union, in addition to the other rights and remedies the employees and the Union have under this contract or the law, shall have the right in its discretion to terminate the contract forthwith as to that employer by giving written notice to said employer.'
 
 
 [12]
 It was there held that despite the section 8(b)(4)(A) proscription against strikes or other coercive conduct to enforce a secondary boycott, an employer may voluntarily sanction and support a boycott and hence his agreement to do so is not unlawful. The Supreme Court said in that case (at page 108, 78 S.Ct. at page 1020): '* * * the Board has no general commission to police collective bargaining agreements and strike down contractual provisions in which there is no element of an unfair labor practice. * * *' It was this decision which motivated Congress to enact the 1959 amendments which added section 8(e), outlawing agreements to engage in secondary boycotts, and added language to section 8(b)(4)(A) making it an unfair labor practice for a union to strike or engage in other coercive activity for the purpose of forcing an employer to enter into an agreement of the kind described in section 8(e). See 2 Leg.Hist. of the Labor-Management Reporting and Disclosure Act of 1959 (Govt.Print.Office, 1959), 1707-1709
 
 
 [13]
 'Respondents' proposed clause, however, precludes handling the work of a subsidiary, and sanctions a sympathy strike at such subsidiary, even in the absence of common control between parent and subsidiary. Cf. Roy (& Sons Co.) v. N.L.R.B., 251 F.2d 771 (C.A.1); Bachman (Mach. Co.) v. N.L.R.B., 266 F.2d 599, 558-559 (C.A.8). 18 (18 Compare Amalgamated Lithographers and Local 78, supra, 1308 NLRB No. 107, 47 LRRM 1380, where the Board found that the Union's 'chain shop' clause was valid because the clause on its face disclosed that it was limited to subsidiaries with respect to which there was common control, as well as common ownership. Whether or not there is actual control in any given case depends, of course, on the particular facts, including the identity of management functions, the extent of interrelation and integration of operations, the measure of control over labor relations policy, etc. See Int. Bro. of Teamsters (Alexander Warehouse and Sales Co.), 128 NLRB 916. While the proposed clause need not specify in detail the individual factors which go into the question of control, the language must be sufficient to manifest an intention to limit its applicability to 'one economic enterprise' (National Union of Marine Cooks and Stewards (Irwin-Lyons Co.), 87 N.L.R.B. 54, 56, 83.)) Hence, as the Board pointed out (R. 62), whether 'the strike be labeled 'sympathy' or otherwise the effect of the 'chain shop' clause is exactly like that of the 'struck work' clause, at least insofar as company and subsidiary are separate employers within the meaning of the Act."
 
 
 [14]
 In that case the Board apparently accepted this as the issue. It determined, however, that the language of the chain shop clause there involved, which, instead of using the term 'subsidiary,' used the phrase, 'wholly owned and controlled by the company or commonly owned and controlled,' sufficiently limited the operation of that clause to a single employer within the meaning of the Act. On review the Fifth Circuit, in the Miami case, held that the chain shop clause was not sufficiently explicit in this regard, and was therefore unlawful, no statutory or other authority being cited for the proposition here under discussion. 301 F.2d 20, at pages 28-29. In Brown v. Local No. 17, Amalgamated Lithographers of America, N.D.Cal., S.D. 180 F.Supp. 294, 301, involving the chain shop clause now before us, it was stated that the regional director of the Board had reasonable cause to believe that the clause is 'atleast in part, in violation of Section 8(e).'
 
 
 [15]
 Truck Drivers and Helpers Local Union No. 728, Affiliated with International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America v. Empire State Express, Inc., 5 Cir., 293 F.2d 414; Bachman Machine Co. v. N.L.R.B., 8 Cir., 266 F.2d 599; J. G. Roy & Sons Co. v. N.L.R.B., 1 Cir., 251 F.2d 771
 
 
 [16]
 This termination clause is to be distinguished from the termination provision of the trade shop clause discussed earlier in this opinion
 
 
 [17]
 'Section 25. Refusal to Handle: The Employers agree that they will not discharge, discipline or discriminate against any employee because such employee refuses to handle any lithographic production work which was made in a shop not under contract with the Amalgamated Lithographers of America or not authorized to use the union label of the Amalgamated or because such employee refused to handle any struck lithographic work of the type described in Sections 23 and 24.'
 
 
 [18]
 In N.L.R.B. v. Insurance Agents' International Union AFL-CIO, 361 U.S. 477, 80 S.Ct. 419, 4 L.Ed.2d 454, it was held that concerted on-the-job activities by union members of a harassing nature designed to interfere with the conduct of the employer's business, for the avowed purpose of putting economic pressure on the employer to accede to the Union's bargaining demands, is not a failure to bargain in good faith as required by section 8(b)(3) and (d). But in that case no unlawful contract clauses were involved. Here the harassing tactics of an overtime ban were employed to obtain agreement to unlawful clauses. We do not read the Insurance Agents' case as a holding that harassing tactics may be employed to gain the inclusion of unlawful contract provisions
 
 
 [19]
 We need not decide whether such a strike is also an unfair labor practice under section 8(b)(4)(B)
 
 
 [20]
 After the strike was called, the employers published an advertisement which was critical of the unions only with regard to their economic demands. During the negotiations the employers made a proposal that the previous contract with struck work and trade shop clauses concededly made illegal by the 1959 amendments, be extended. It was customary for local 17 to ban overtime work upon the termination of its contract and the instant ban was, in that respect, a continuation of this practice not related to any particular proposals
 
 
 [21]
 On November 20, 1959, the employers offered to secure the aid of the Federal Mediation Service to break the deadlock in negotiations over the disputed clauses. The president of Local 17 rejected the proposal stating that 'this language could not be changed by anyone any way so why bring them in.'
 
 
 [22]
 The fact that we have held herein that two of the five disputed clauses are not unlawful does not call for a different result since the unlawfulness of the remaining three clauses provides a sufficient foundation for the Board's findings now under discussion
 The fact that it is the customary practice of the unions to initiate an overtime ban whenever a contract expires and a new one is under negotiation is immaterial in the context of this case. There was evidence credited by the Board indicating that the purpose of this particular overtime ban was to obtain acceptance of the questioned clauses.
 
 
 [23]
 In the absence of extraordinary circumstances, a court of appeals may not consider objections which were not raised before the Board. 29 U.S.C.A. 160(e); N.L.R.B. v. District 50, United Mine Workers of America, 355 U.S. 453, 464, 78 S.Ct. 386, 2 L.Ed.2d 401